Stilt v. Hilton.

JOHN W. STILT

v.

HENRY HILTON, WILLIAM LIBBEY, CORNELIA M. STEWART, and others.

1. Where the facts on which the equity of a bill rests are positively and explicitly denied by the defendant on his personal knowledge, as a general rule the defendant is entitled to a dissolution of the injunction.

2. To exempt a case from the operation of the general rule, it must appear that a dissolution will deprive the party holding the injunction of all relief, in case he is finally successful, or that a dissolution will subject him to some other irreparable injury, or place him in a position of peculiar hardship.

On motion to dissolve injunction, heard on bill and affidavit, and answer and affidavit.

*Mr. Thomas N. McCarter*, for motion.

*Mr. R. W. Parker* and *Mr. Cortlandt Parker, contra.*

THE VICE-CHANCELLOR.

The injunction the defendants seek to have dissolved, enjoins the defendant, Henry Hilton, from further prosecuting an action of ejectment brought by him against the complainant to recover certain lands in the county of Essex. These lands, with others, were conveyed by the complainant to Alexander T. Stewart, November 3d, 1875. Hilton has

since, in due form, been invested with Stewart's title. In 1870 the complainant was extensively engaged in the manufacture of woolen goods, having two mills at Little Falls, New York, one called the Mohawk and the other the Elbœuf, and another at Franklin, New Jersey, known as the Yantico. He carried on business in connection with Benjamin Underhill, his copartner, under the name of Stilt & Underhill, but the title to the real estate used for the purposes of the business, as well as that now in controversy, was held by the complainant.

About the 1st of February, 1870, A. T. Stewart & Co. consented to become the factors of Stilt & Underhill, and by a written contract, bearing date February 8th, 1870, agreed to receive all the productions of their mills, to make advances to the extent of seventy-five per cent. of the market value of the goods delivered, charging interest thereon at the rate of seven per cent. per annum, and to make sales and guaranty payment for seven per cent. of the gross amount of sales. The contract stated that the commission for selling should be three and a half per cent.; for guaranteeing, two and a half; and for charges, one. It further provided, that the factors should render monthly accounts of sales and weekly statements, and that either party should be at liberty to put an end to the contract at any time by giving written notice to the other. This arrangement continued until June, 1874.

On the 23d of June, 1874, Stilt & Underhill, by letter, directed A. T. Stewart & Co. to account to them for all sales, on a uniform basis, or at one general rate, viz. : As though all sales were made on a credit of thirty days, with a discount of five per cent. to the buyer, though they may, in fact, have given a much larger credit, and consequently made no discount at all to the buyer, or much less than that appearing on the account. The defendants say the commission of two and a half per cent. for guaranty was based on an understanding that all sales were to be made on a credit of six months, the buyer having a right to pay at any

time before maturity, and to be allowed a discount of one per cent. a month for the period his payment should anticipate the maturity of his bill.

By a letter dated July 1st, 1874, Stilt & Underhill authorized A. T. Stewart & Co. to give buyers extra time, and allow them a discount at the same rate for such additional time.   These arrangements continued in force up to October 25th, 1875, a business having been transacted under them aggregating a value of over $4,000,000.

The account of A. T. Stewart & Co. at this time showed a large balance against Stilt & Underhill, greatly in excess, as the defendants say, of their security, and they therefore required Stilt & Underhill either to pay or to give them additional security.   This demand was met by a letter from the complainant, bearing date October 23d, 1875, proposing to pass over to A. T. Stewart & Co. all the goods in their hands and the Mohawk and Elbœuf mills, with their contents, in payment of the balance standing in their favor, they to pay the complainant, in addition, $130,000, and assume the payment of the amount then due on the payrolls of the mills, amounting to $12,000 or $13,000.   This offer was not accepted.   Subsequently the complainant signed a contract, bearing date October 25th, 1875, whereby, after admitting an indebtedness by Stilt & Underhill to A. T. Stewart & Co. of over $1,123,000, he agreed to convey to Alexander T. Stewart the three mills already mentioned, together with the lands connected with them ; also all his lands in New Jersey and New York, and also to transfer to Mr. Stewart all the wool stock on hand, whether manufactured or unmanufactured, on condition that the same should be managed, controlled and sold according to the best judgment of A. T. Stewart & Co., and the proceeds applied in discharge of the debt due to them from Stilt & Underhill. The contract also stated that Stilt & Underhill were indebted to other persons in the sum of $130,000, and directed that these debts should also be paid out of the proceeds of sale of the property to be conveyed and transferred to Mr.

38

Stewart, and that if any surplus remained after the payment of the debts designated and the expenses of the conversion, it should be paid to the complainant. At its conclusion the contract stated that it was made upon condition that the indebtedness of Stilt & Underhill to others than A. T. Stewart & Co., did not exceed $140,000. The lands in controversy were conveyed by the complainant in execution of this contract. Neither Alexander T. Stewart nor his firm signed the contract; they, however, took possession of the property made over under it, made some of the payments required by it, and sold some of the property.

The defendants say it was very soon found that the debts of Stilt & Underhill to others than themselves were much greater than they had been represented to be, and that they at once, on discovering this to be the fact, notified the complainant that they would not, in consequence of his misrepresentation, carry out the contract, and offered to reconvey his property on being paid the amount due to them, including the sums they had paid out under the contract. The defendants also say the complainant met this offer with an expression of regret that he had been so much mistaken in his estimate of his debts, and declared his inability to pay them what he owed them, and then proposed to release all claim to the property already made over, on condition that the defendants should pay all his debts, which he then represented to be $220,000. This proposition was reduced to writing by the defendant Hilton, and sent to the complainant by his copartner, who procured the complainant's signature to it and then signed it himself. This paper bears date December 14th, 1875. By it the complainant, after stating that it was plain the agreement of October 25th, 1875, could not be carried out in consequence of his debts being much larger than he had supposed they were, and that it was impossible for him to accept a reconveyance upon the terms proposed, submitted a proposition in these words:

"I therefore propose, and now declare, that our original plan and arrangement shall be cancelled and annulled; that you shall hold the

Stilt v. Hilton.

property so transferred and conveyed to you, free from any claim whatever, of either myself, my firm or anybody else; that I and my firm will execute and deliver such releases and other papers as you may consider advisable to effectuate this purpose, and that, as a consideration for this, you shall continue to advance the moneys necessary to pay my indebtedness to all my creditors except yourselves."

This paper also contained an assurance, quite as strong as words could make it, that the debts of Stilt & Underhill to others than the defendants did not exceed $220,000.

The defendants also allege that, inasmuch as it was perfectly manifest they must, under any circumstances, suffer great loss in consequence of their large advances to Stilt & Underhill, and the proposition of the complainant giving them, as they thought, the best means possible of mitigating their loss, they accepted it, and afterwards paid out, in fulfillment of its terms, over $76,000.

If the papers in the case accurately express the intention of the parties, it would seem to be clear that the right of the plaintiff in ejectment to the possession of the lands in controversy was unquestionable. Although originally conveyed subject to a trust, the terms of the trust gave the complainant no right to possession. When he divested himself of title, all right to possession, equitable as well as legal, passed with it, and he ceased to have any right in respect to the lands, except to have the trust faithfully executed. The special equity, however, upon which the complainant puts his right to retain possession is, that all the contracts between himself and the defendants mentioned in his bill, except the first, were procured from him by means which render them of no force or effect. He does not deny that the defendants have conducted their business and kept their accounts strictly in accordance with the terms of the contracts, but he charges that the contracts were obtained by fraud and coercion. He says the letter of June 23d, 1874, directing A. T. Stewart & Co. to account for all sales at one general rate of discount, or as though all sales were made on a credit of thirty days, was sent to him with a

demand that he should sign it; that he at once took it to
the defendant, Libbey, and inquired what it meant, and
was told that it was intended to cover charges for extra
interest; he says he then said he would not sign it, and that
Libbey thereupon replied, if he did not, A. T. Stewart &
Co. would at once cut off all further advances.   He says, at
that time he was unable to find his copy of the first con-
tract, bearing date February 8th, 1870, and therefore
believed he had no proof in writing of the original under-
standing; that his firm was then largely indebted to A. T.
Stewart & Co., and being, as he thought, entirely at their
mercy, he believes, after protest for some days, he or his
partner signed it.   Though he says he at first positively
refused to sign this paper, and for some days afterward
resisted the force employed to coerce him to sign it, yet he
also says it did not make much impression upon his mind
at the time, and for that reason he did not look into the
accounts, nor get a correct apprehension of the hardship of
the bargain until long afterwards.   He attempts no expla-
nation of his letter of July 1st, 1874, though it was mani-
festly intended as a mere extension or appendage to the
arrangement established by his letter of June 23d, 1874.
If the letter of July 1st was the voluntary expression of his
will, it will be very difficult to believe that that of June 23d
was not.

With regard to the contract of October 25th, 1875, and
the conveyances made in fulfillment of it, the complainant
charges that they were executed without the advice of
counsel, and when he was so sick and weak, and so com-
pletely prostrated, as to be incompetent, both mentally and
physically, to transact business of any kind.   He further
says that he was told by the defendant, Hilton, not to
employ counsel; that he would draw all the papers for both
parties that were necessary; that the deeds were taken
merely to satisfy Mr. Stewart, and, as the property was an
ample security for the debt, the transfers were, at most, but
a mere temporary expedient.   After the execution of the

deeds, he says he continued " nervously prostrated," and unable to do *much* business, and, while in this condition, and when he was sick in bed, a new agreement was sent to him, which he was told he must sign or A. T. Stewart & Co. would let the business paper of Stilt & Underhill go to protest. He also says that he signed the new agreement without reading it, and that immediately thereafter A. T. Stewart & Co. took possession of the mills, and assumed the exclusive management of the business. He gives no information respecting this paper, further than to say that he supposed it was designed to put the business of Stilt & Underhill further under the control of A. T. Stewart & Co. So far as appears, he has never asked to see it, or to be informed of its contents. His want of curiosity as to the character and effect of this paper can only be accounted for by believing either that he knows more about it than he pretends he does, or that he has been most unnaturally indifferent respecting the consequences of his own acts. Granting it to be possible that the threat alleged to have been made at the time he was required to sign did not, in consequence of his weakness, provoke his resistance or prompt him to make a careful examination of the paper, still, if he was, in fact, ignorant of the authority under which the defendants claimed to act, it would seem to be almost beyond belief that, after his strength was restored, and he found the defendants in the possession of his property, doing with it whatever they willed, regardless of his rights, he should have permitted them to continue in the full enjoyment of it without questioning their right or even asking to know by what authority they justified their acts. His unconcern respecting the use and management of the property could not have been greater if he had been entirely satisfied he had no interest whatever in it.

The defendants have met every material averment of the bill upon which the complainant's right to an injunction rests, by a positive and explicit denial. Their denials are made upon personal knowledge, and embrace a circumstan-

tial history of each transaction displayed by the complainant as the foundation of his equity. The facts exhibited by the defendants leave the complainant's case destitute of the slightest equity, and place him in a position where his conduct requires explanation and defence. According to his own statement, he stood quietly by, after he had signed a paper which he supposed was intended to place his property more completely under the control of the defendants, and allowed them to pay out over $76,000 of their moneys in discharge of his debts. If, at that time, he meant to repudiate his act, but remained silent and apparently acquiescent, so as to gain the advantage that would flow to him from the performance by the defendants of their part of the contract, he has committed a very mean fraud upon the defendants, and has no right to ask the court to exercise its prohibitory power in his behalf.

It is quite unnecessary to repeat or even summarize the facts exhibited by the defence. It is enough to say the papers in the case, as well as the complainant's conduct, raise strong doubts as to the truth of his story and the purity of his motives. It seems almost incredible that a man of mature years, and of large business experience, who for fifteen years had stood at the head of a large manufacturing establishment, where he was constantly controlling the action of others, could, in the first place, be dragooned into signing a contract he never made, and that he would immediately afterwards, for over a year, submit unresistingly to the exactions made under it, and that he would, at last, when the catastrophe of the plot was reached, yield up everything without a struggle or the least demonstration of resistance. It is not pretended that the fairness or validity of the arrangement of June 23d, 1874, after its execution, was ever the subject of discussion, or even of consideration, by the parties; nor is it claimed that the complainant ever, in any way, challenged the validity of the arrangement of December 14th, 1875, until after he was required to surrender the possession of the lands now

in dispute. On this motion it is impossible not to regard the complainant's conduct as decisive evidence in favor of the integrity of the papers under which the defendants claim.

It is proper to add, the complainant also claims that the contract of June 23d, 1874, was usurious, and must, therefore, by force of the laws of the state of New York, where the contract was made, be declared void. Conceding this to be true, it is difficult to see how it can help the complainant on this motion. For if it be true, as it now seems to be, that the defendants have, upon the complainant's promise to relinquish any claim whatever in the property, paid out a very large sum of money in discharge of his debts, it would seem to be clear that he should not be permitted, at the very threshold of his suit, to withhold from the defendants the very thing he promised to give them for their money. A court of conscience cannot permit him to keep both the thing sold and the consideration he received for it. He is the actor here, and cannot have justice until he is willing to do justice.

Where the facts on which the equity of a bill rests are positively and explicitly denied by the defendant, on his own personal knowledge, and not merely by way of argument or inference, or upon information and belief, the general rule is, the injunction will be dissolved. *Suffern* v. *Butler*, 3 *C. E. Gr.* 220; *Everly* v. *Rice*, 3 *Gr. Ch.* 553; *Boston Franklinite Co.* v. *N. J. Zinc Co.*, 2 *Beas.* 215. There are exceptions to this rule, but to relieve a case from its operation, it must appear that a dissolution will deprive the party holding the injunction of all relief, if he is finally successful, or that a dissolution will work some other irreparable mischief, or place him in a position of peculiar hardship. *Greenin* v. *Hoey*, 1 *Stock.* 137; *Scott* v. *Ames*, 3 *Stock.* 261.

This case, in my judgment, is destitute of every element necessary to exempt it from the operation of the general rule. The facts exhibited by the complainant as the warrant for the interdict of this court, have been swept away by

the responsive and circumstantial denials of the defendants. If the complainant shall hereafter show that his facts are true and the defendants' are false, so far as it is now possible to judge, from the facts before the court, there will be no difficulty in making the decree he may obtain effectual unto him. As the case now stands, no consideration of justice or safety appears which makes it the duty of the court to further interdict the prosecution of the suit at law.

The injunction must be dissolved, with costs.